ROMAN CATHOLIC BISHOP OF SPRINGFIELD, Plaintiff

v.

CITY OF SPRINGFIELD, et al., Defendants.

C.A. No. 10–cv–30033–MAP.

United States District Court, D. Massachusetts.

Jan. 4, 2011.

Edward J. McDonough, Jr., John J. Egan, Egan, Flanagan & Cohen, P.C., Springfield, MA, for Plaintiff.

Edward M. Pikula, Harry P. Carroll, City of Springfield Law Department, Springfield, MA, for Defendants.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT* (Dkt. Nos. 14 & 22)

PONSOR, District Judge.

## I. *INTRODUCTION*

This lawsuit places the court at the intersection of two important, protected rights: the right of a religious entity to manage its places of worship in accordance with church law without oversight by secular authorities, and the right of the larger community to have a role in the preservation of a beloved landmark that was once a church. In this case, Plaintiff Roman Catholic Bishop of Springfield challenges, as unenforceable, a local ordinance that might result in the imposition of architectural restrictions on Our Lady of Hope Church in downtown Springfield, Massa-

chusetts. Services terminated at Our Lady of Hope in January 2010, and the ordinance in question, Section 2.46.030(G) of the Revised Ordinances of the City of Springfield ("the Ordinance"), would require Plaintiff to submit to oversight by the Springfield Historical Commission before altering physical aspects of the church building, possibly including sacred religious iconography.

The complaint sets forth twelve counts alleging, *inter alia*, that the Ordinance violates provisions of 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), as well as Plaintiff's right to the free exercise of religion under the United States Constitution and the Massachusetts Declaration of Rights.

Plaintiff has filed a motion for summary judgment on all counts, seeking both declaratory and injunctive relief that would invalidate the Ordinance. Defendants have filed a cross motion for summary judgment, asking the court to declare that Plaintiff is obliged to comply with the Ordinance by filing a timely application with the Springfield Historical Commission before attempting to alter or demolish any exterior architectural features of the church. For the reasons set forth below, Plaintiff's Motion for Summary Judgment (Dkt. No. 14) will be denied, and Defendants' Cross Motion for Summary Judgment (Dkt. No. 22) will be allowed.

It is important to emphasize at the outset that a significant portion of the court's rationale is anchored on the doctrine of ripeness. The sum and substance of this ruling is this: the Ordinance's requirement that Plaintiff submit a plan *for review* violates neither statutory nor constitutional law. If a plan should be formulated and submitted pursuant to the Ordinance, the response of the Historical Commission

may change the constitutional picture significantly and entitle Plaintiff to further judicial consideration.

## II. *FACTS*

### A. *The Parties.*

Plaintiff Roman Catholic Bishop of Springfield is a corporation sole,[1] the legal entity through which the Roman Catholic Diocese of Springfield ("the Diocese") operates. The Diocese covers the four western counties of Massachusetts and serves approximately 250,000 Roman Catholics who reside here. Plaintiff names as defendants the City of Springfield ("the City") and, individually, Mayor Dominic J. Sarno and City Councilors Patrick J. Markey, William T. Foley, Rosemarie Mazza–Moriarty, Timothy J. Rooke, Bruce W. Stebbins, Jose Tosado, Kateri Walsh, Bud L. Williams, and James J. Ferrera, III ("Individual Defendants").

### B. *Closing the Our Lady of Hope Church.*

In 1906, Plaintiff established Our Lady of Hope Parish in Springfield, Massachusetts. The parish supported Our Lady of Hope Church, located, as noted, in downtown Springfield at the southwest corner of Carew and Armory Streets. In 1925, the Our Lady of Hope Church was built; a rectory, convent, and school followed within a few years. Our Lady of Hope was the first parish church for the Irish immigrants of the "Hungry Hill" section of the City.

Due to a decline in the number of clergy and parishioners, in October 2004 the Bishop of the Diocese, the Most Reverend Timothy A. McDonnell, initiated an internal study of how best to allocate the Diocese's human and financial resources. The Bishop formed a committee of clergy and parishioners, known as the Pastoral Planning Committee, to undertake this process. In August 2009, the Committee submitted to the Bishop its final recommendations, which called for the closing of Our Lady of Hope and for the merger of the parish with St. Mary's East Springfield to form a new parish by the name of St. Mary Mother of Hope. On January 1, 2010, the Bishop adopted these recommendations and ended religious services at Our Lady of Hope.

According to the Canon Law of the Roman Catholic Church, a closed parish may begin the process of deconsecrating church property, in which all materials are "reduced to profane (non-sacred) use" but not "sordid use."[2] (Dkt. No. 17, Ex. 3 Bonzagni Aff. ¶ 20.) The Diocese has set forth specific procedures for deconsecrating

---

1. Unlike a corporation aggregate, which is simultaneously operated by multiple persons, a corporation sole consists of only one person at a time. However, a corporation sole may pass through generations of people, from one individual to the next, without any disruption to its legal status. It has the same rights and obligations as other corporations. *See* 18 Am. Jur.2d Corporations § 28 (West 2010).

2. This language derives from the Code of Canon Law of the Roman Catholic Church, which states that "[i]f a church cannot be used in any way for divine worship and there is no possibility of repairing it, the diocesan bishop can relegate it to profane but not sordid use."

*1983 Code c. 1222, § 2.* "Profane use" means use for purposes other than a Roman Catholic worship service, while sordid use refers to "[t]he denunciation of the Catholic Church and the Catholic Faith, the desecration of Catholic objects of devotion and worship or even any disrespectful or casual treatment of such objects, and/or the proselytizing of Catholics." Roman Catholic Archbishop of Boston, A Corporation Sole's Policy on the Sale of Church Buildings, http://www.bostoncatholic.org/uploadedFiles/Boston Catholicorg/Parishes_And_People/Policyon SaleofChurchBuildings0711.pdf (last visited January 3, 2011).

church property in a manner consistent with Canon Law:

> First, efforts are made to relocate any such symbols to other Catholic locations within the Diocese of Springfield. Second, efforts are made to relocate such articles to other Catholic locations outside the Diocese of Springfield. Third, such articles may be removed and placed in storage for future use. Fourth, where religious symbols are not deemed proper for storage, Canon Law mandates that steps be taken to make certain that such sacred symbols are not desecrated or put to sordid use. Simply [put], all such items are properly destroyed.

(Dkt. No. 17, Ex. 4 Pomerleau Aff. ¶ 5). One final alternative is the sale of church property, which requires that either (1) the purchaser agree not to desecrate the property or put it to sordid use; or (2) church officials be permitted to remove all religious symbols from the property. (*Id.* at ¶ 6.)

Here, the church property at issue takes a variety of shapes, as detailed in the complaint:

1. Our Lady of Hope is a Latin-cross church.

2. The frieze of the portico's architrave is inscribed "IN LOCO ISTO DABO PACEM" ("In this place I will grant you peace").

3. In its tympanum is a cast stone relief of the Madonna and Child attended by Angels.

4. Above the pedimented portico in the gable field of the church is an escutcheon of the Madonna (Mary, the mother of Jesus Christ) a crowned letter "M."

5. Above each entry to the church is an inscription: "PAX INTRANTIBUS" ("Peace to those who enter"), "HAEC ES PORTA DOMINI" ("This is the Gate of the Lord"), and SALUS EXEUNTIBUS ("Blessing to those who leave").

6. Entry to the campanile is beneath an arched opening with cast stone relief of the Apostle and in its tympanum angels flanking the letters "[IHS]," symbolizing the first three letters of the name of Jesus in classical Greek, above a frieze inscribed "HOC EST CORPUS MEUM" ("This is my body").

7. [F]our large stone crosses and sixty-five stain glass windows depicting significant events in the life, death and resurrection of Jesus Christ.

(Compl. ¶¶ 14, 17.)

It is particularly significant for purposes of this stage of the litigation that Plaintiff's plans for deconsecrating Our Lady of Hope are still in the development phase and have not been finalized. Whether the ultimate plans would be subject to the Ordinance's strictures, or would be exempted from them, is not, therefore, known at this time.

## C. *The "Our Lady of Hope Historic District".*

In late 2009, rumor of Our Lady of Hope's possible closing spread quickly. Concerned about the fate of the church, some Springfield citizens urged the City to take preemptive action by creating a new historic district encompassing the church.[3]

---

**3.** In a letter petitioning the Springfield City Council to enact this Ordinance, State Representative Sean Curran described the Church as an "architectural jewel" and noted that

"[o]ne does not have to be an expert in historical buildings to know instantly that it would be impossible to build a structure such as Our

The Historic Districts Act gives municipalities the power to enact individual ordinances establishing the confines of each historic district. The Act offers several considerations for selecting a historic district:

> the historic and architectural value and significance of the site, building or structure, the general design, arrangement, texture, material and color of the features involved, and the relation of such features to similar features of buildings and structures in the surrounding area.

Mass. Gen. Laws ch. 40C, § 7 (West 2010). The heart of the Act is its provision regarding alterations of a building's architectural design:

> [N]o building or structure within an historic district shall be constructed or altered in any way that affects exterior architectural features unless the commission shall first have issued a certificate of appropriateness, a certificate of non-applicability or a certificate of hardship with respect to such construction or alteration.

Mass. Gen. Laws ch. 40C, § 6 (West 2010). To obtain an approval or exemption, landowners must submit engineering plans and make a presentation to the local historical commission. Currently, there are more than two hundred local historic districts in Massachusetts, and eight exist in the City of Springfield, including the one at issue here.[4]

In September 2009, the City's Office of Planning and Economic Development sent a report to the Springfield Historical Commission ("the Commission") detailing its proposal for the "Our Lady of Hope Local Historic District." The report noted that the Our Lady of Hope Church "represents the best work of Springfield architect John Donohue" and is "a well-preserved example of the Italian Renaissance design." (Dkt. No. 26, McCarroll Aff. Ex. 4 at 4.) The report also offered a pragmatic reason for its decision: designating the Church a local historic district would allow it "to avoid the same possible fate" as St. Joseph's Church, which was sold to a developer shortly after its closing and was eventually demolished. (*Id.* at 3.)

---

Lady of Hope today." (Dkt. No. 26, McCarroll Aff. Ex. 3.)

4. Interestingly, in establishing the "Quadrangle–Mattoon Street Historic District," its first historic district, the City of Springfield expressly exempted properties owned by Plaintiff and by the Springfield Library and Museums Association, Inc. ("the Association"). *See* Springfield, Mass., Rev. Ordinances ch. 2.46, § 2.46.030(A). This exemption was later challenged as being an invalid application of the Historic Districts Act. *Springfield Preservation Trust, Inc. v. Springfield Library & Museums Ass'n, Inc.*, 447 Mass. 408, 852 N.E.2d 83 (2006). Upholding the provision (Subsection A), the Massachusetts Supreme Judicial Court determined that the exemption applied only to property owned by the above-referenced entities in 1972, the date of the ordinance's enactment. *Id.* at 97.

The language used in Subsection A, which declares that "the authority of [the Springfield Historical] commission shall . . . be limited so as not to extend to any buildings, structures or properties however owned or controlled" by Plaintiff or the Association, is remarkably broad. Springfield, Mass., Rev. Ordinances ch. 2.46, § 2.46.030(A). On its face, this provision might be interpreted to create a blanket restriction on the Commission's authority to regulate property owned by Plaintiff. Because Plaintiff owned the Our Lady of Hope Church well before 1972, an argument could be made that the exempting provision should govern the property at issue here. However, neither Plaintiff nor Defendants have addressed this possibility in their briefs. Their silence suggests that they both interpret this provision as applying only to the Quadrangle–Mattoon Street Historic District referenced in Subsection A, and not to the seven other historic districts established in Subsections B through H. The court will therefore pursue the issue no further.

On December 14, 2009, the Commission held a public hearing to discuss the possibility of creating a local historic district. Plaintiff's counsel attended this hearing and voiced Plaintiff's opposition to the proposed ordinance.[5] Nonetheless, at the conclusion of the hearing the Commission voted to approve the Ordinance, Section 2.46.030(G) of the Revised Ordinances of the City of Springfield, creating the "Our Lady of Hope Historic District" around the single parcel of land on which the church sits. The Commission then sent its report to Defendant City Councilors, who approved the Ordinance on December 29, 2009. Shortly thereafter, Defendant Mayor Sarno signed the Ordinance into law.

Rather than file for a certificate of exemption as required by the Ordinance, Plaintiff, instead, filed this lawsuit seeking both declaratory and injunctive relief.

## III. *DISCUSSION*

The complaint consists of twelve counts, with mirror claims under both state and federal law for violations of the free exercise of religion (Counts One and Two); freedom of speech, expression, and assembly (Counts Three and Four); and equal protection (Counts Five and Six). Count One also includes an Establishment Clause challenge. Count Seven asserts a violation of the Due Process Clause of the Fourteenth Amendment. Counts Eight, Nine, and Ten assert violations of 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Count Eleven asserts a violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I. Count Twelve does not state a cause of action but rather contains a prayer for relief based on the Massachusetts Declaratory Judgment Act, Mass. Gen. Laws ch. 231(A).

After setting forth the applicable legal standard, the court will address Defendants' preliminary arguments concerning ripeness and personal liability, before moving on to the substance of the complaint.

### A. *The Summary Judgment Standard.*

It is well established that "when a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). The non-movant cannot rest upon mere allegations; rather, it must set forth "specific, provable facts demonstrating that there is a triable issue." *See Brennan v. Hendrigan,* 888 F.2d 189, 191 (1st Cir.1989). *See also* D. Mass. R. 56.1 (requiring that a non-moving party's opposition to a motion for summary judgment include "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation").

Neither side has pointed to any issue of fact barring summary judgment; each argues that on the undisputed facts a favorable ruling on its motion is therefore required as a matter of law.

### B. *Ripeness.*

As a threshold matter, Defendants argue that Plaintiff's claims are not ripe because Plaintiff never applied to the Springfield Historical Commission for a certificate of exemption. Plaintiff vigor-

---

**5.** Plaintiff asserts, and Defendants deny, that he was not given proper notice of this hearing. This dispute is not material, and, in any event, it is moot in light of the fact that Plaintiff's counsel appeared at the hearing.

ously responds that the mere enactment of the Ordinance constituted an infringement of its constitutional and statutory rights. In this posture, the parties' arguments sail past one another like ships in the night.

To better frame the ripeness issue, the court will distill the alleged violations into two temporal facets: (1) violations that arise from the mere enactment of the single-parcel historic district, which only burdens Plaintiff's property and forces Plaintiff to submit to a secular authority; and (2) violations that arise from Plaintiff's resulting inability to deconsecrate church property. Given this important distinction, the court will bifurcate its analysis of these issues. *See Gilbert v. City of Cambridge*, 932 F.2d 51 (1st Cir.1991) (conducting independent ripeness analysis for each of the claims alleged).

1. *Creation of a Single–Parcel Historic District.*

■ Plaintiff first argues that the mere enactment of the Ordinance violates its rights. This argument subdivides into two separate claims. First, historic-district status requires Plaintiff to file for a certificate of exemption before making changes to the exterior of its church, resulting in "delay, uncertainty and expense." (Pl.'s Mem. Supp. Mot. Summ. J. at 30.) The court will refer to this as the "administrative burden" argument. Second, because the Ordinance only burdens the Our Lady of Hope Church, Plaintiff argues that the City has improperly targeted church property for unfavorable treatment. For the reasons set forth below, these two claims are ripe for adjudication by this court.[6]

■ The doctrine of ripeness derives from the constitutional requirement that federal courts hear only "actual cases or controversies," and its basic rationale is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Whether a case is ripe for adjudication turns on "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. When determining fitness, "the critical question ... is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Ernst & Young v. Depositors Econ. Protection Corp.*, 45 F.3d 530, 536 (1st Cir. 1995) (quotation marks and citations omitted). When determining hardship, the basic rule is that "the greater the hardship, the more apt a court will be to find ripeness." *Id.* These determinations are highly fact-specific. *Id.* at 535.

■ Although both prongs of the test ordinarily must be satisfied in order to establish ripeness, this test is not rigid:

> [T]here may be some sort of sliding scale under which, say, a very powerful exhibition of immediate hardship might compensate for questionable fitness (such as a degree of imprecision in the factual circumstances surrounding the case), or vice versa.

*Id.*

Defendants argue that the administrative burden alleged here is both specula-

---

**6.** Defendants incorrectly label these claims "facial challenges." Although Plaintiff's claims purport to attack the Ordinance itself, the Ordinance merely codifies the City's determination that the Historic Districts Act applies to Plaintiff's property. The Ordinance has no independent power. Thus, while Plaintiff's claims appear to challenge the Ordinance on its face, in fact they represent a challenge to the Historic Districts Act as applied to Plaintiff's property. The court discusses this issue in greater detail in the text that follows.

tive and insignificant, and, therefore, the issue is unfit for adjudication. However, this argument is more properly addressed to the weight of Plaintiff's claim. The Ordinance restricts certain alterations of Plaintiff's property and requires an application and review process, to the exclusion of all other properties in the City not covered by this Act. Plaintiff contends that these restrictions alone constitute violations of state and federal law. Since the requirement to submit to secular authority applies, regardless of whether the City ultimately approves or rejects Plaintiff's application for an exemption, and since this submission to non-church authority is in itself offensive to Plaintiff, this issue is ripe for adjudication.

### 2. *Preventing Plaintiff from Deconsecrating its Church.*

■ The second set of claims involves the effect of the Ordinance on Plaintiff's ability to deconsecrate its property. In its briefs and at oral argument, Plaintiff repeatedly stressed the religious significance of this process, which, at its core, involves the preservation or proper disposition of deeply religious symbols. Plaintiff argues that the Ordinance prevents it from properly preserving these symbols and potentially distributing them to other churches. These symbols contain both words and images that convey religious messages sacred to the Catholic Church. Assuming the Historical Commission rejects Plaintiff's plan (as yet unknown) to dispose of the architectural features that give form to these religious messages, then the effect of the Ordinance would be to permanently "freeze" these sacred messages onto deconsecrated property that could ultimately be put to "sordid" use. (Pl.'s Mem. Supp. Mot. Summ. J. at 5.)

The difficulty with this argument is that it assumes that the Ordinance, by requir-

ing review by the Historical Commission, will necessarily prohibit whatever plan Plaintiff ultimately adopts to modify the architectural features of the church. The Ordinance itself creates no such inevitability. The Ordinance, by reference to the Historic Districts Act, merely prohibits alterations that "in any way affect[ ] exterior architectural features *unless the commission shall first have issued a certificate [of exemption]*." Mass. Gen. Laws ch. 40C, § 6 (West 2010) (emphasis added). It is possible that Plaintiff's plan, once crafted, will be entirely satisfactory to the Commission; put differently, it is impossible to say that the plan will be deemed unsatisfactory, since the plan does not exist and cannot be reviewed.

Recognizing this problem, Plaintiff has argued in its second opposition brief that filing an application for an exemption would be futile. (Dkt. No. 29, Pl.'s Opp'n to Defs.' Mot. Summ. J. at 7.) Plaintiff reasons that the City's decision to pass the Ordinance over its vehement opposition demonstrates a flat unwillingness to give consideration to its religious concerns. Moreover, "the scope of the exemption which would be needed ... would completely undermine the purported justification for the [Ordinance.]" (*Id.* at 5.)

■ These arguments are unpersuasive. As a general rule, a property owner must seek a variance or file an appeal with a local zoning board before filing suit. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). In *Williamson,* the Court observed that "it is impossible to determine the extent of the loss or interference until the [government entity] has decided whether it will grant a variance from the application of the regulations." *Id.* at 191 n. 12, 105 S.Ct. 3108. It is true that the First Circuit has recognized a narrow "futility" exception to this

general rule. *Gilbert v. City of Cambridge*, 932 F.2d 51, 60–61 (1st Cir.1991). However, "[t]o come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." *Id.* at 61. Additionally, "the filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception." *Id.*

Plaintiff's failure to file "one meaningful application" puts it in a difficult position: it must prove that the prospect of the City refusing to grant its application for an exemption is certain or nearly certain. *See Gilbert*, 932 F.2d at 61. Plaintiff's arguments do not satisfy this stringent standard.

Contrary to Plaintiff's assertions, nothing in the Ordinance or the Historic Districts Act makes an exemption for Our Lady of Hope Church impossible or even unlikely. The Act allows municipalities to grant the following certificates of exemption:

(1) a certificate of appropriateness where the proposed alteration is "appropriate for or compatible with the preservation or protection of the historic district;"

(2) a certificate of nonapplicability where the proposed alteration "does not involve any exterior architectural feature, or involves an exterior architectural feature which is [exempted by this Act];" and

(3) a certificate of hardship where, "owing to conditions especially affecting the building or structure involved, but not affecting the historic district generally, failure to approve an application will involve substantial hardship, financial or otherwise, to the applicant."

Mass. Gen. Laws ch. 40C, § 10 (West 2010). The City might well determine that Plaintiff's circumstances warrant either a certificate of appropriateness or a certificate of hardship. A certificate of hardship seems like a very real possibility, given that the exemption applies to any hardship "financial or otherwise," *id.*, and Plaintiff makes a strong argument that the inability to deconsecrate the Church would result in religious hardship.

In short, the City's decision to pass the Ordinance in no way predetermines the outcome of an application for an exemption. Indeed, the Historical Commission's stated reason for proposing the Ordinance was to prevent the outright demolition of the Church. (*See* Dkt. No. 26, Ex. 4 McCarroll Aff. at 3). It would be perfectly consistent for the City to enact this Ordinance in an effort to stave off the possibility of demolition and later provide an exemption for Plaintiff to remove features of the Church's facade. In any event, the prospect of refusal is far from certain. *See Gilbert*, 932 F.2d at 61.

In addition, it is not clear that Plaintiff will even need to file for an exemption. At present, Plaintiff has not decided on a specific plan of action that it will take with respect to its religious symbols. In his affidavit, Reverend William Pomerleau discusses several possibilities, one of which is the sale of the Church to a buyer who agrees not to put the symbols to sordid use:

As a condition of any such sale, an agreement must be reached between the Bishop and the purchaser that any religious symbols may not be desecrated or put to a sordid use. If such an accommodation cannot be reached, all religious symbols are removed from the interior and exterior of the building.

(Dkt. No. 17, Ex. 4 Pomerleau Aff. ¶ 6). The court can conceive myriad potential uses of the deconsecrated church building that would not require changes to the

building's facade. With this outcome, the controversy between the parties would disappear. Thus, given that Plaintiff's claim rests on "uncertain and contingent events that may not occur as anticipated or may not occur at all," *Ernst & Young,* 45 F.3d at 536, these facets of Plaintiff's claims are not fit for review at this time.

As to hardship, Plaintiff's attempt to prove a burden created by the application process itself is weak and unpersuasive. *See* Part D *infra.* Moreover, even a showing of more substantial hardship would not suffice to compel the court to address issues that are so clearly unfit for adjudication. Thus, this claim is not ripe for review.[7]

For the sake of clarity, the court emphasizes that this ruling only applies to those claims premised on Plaintiff's inability to deconsecrate its church. Due to the overlapping nature of Plaintiff's allegations, this ripeness ruling only eliminates Counts Three and Four in their entirety because Plaintiff's freedom-of-speech claims derive solely from its alleged inability to remove religious messages from its property. At this point in the discussion, the remaining counts survive insofar as they are premised on the Ordinance singling out Plaintiff for unfavorable treatment and imposing an inappropriate administrative burden on Plaintiff's religious exercise.

## C. Claims against Individual Defendants.

■■■ Individual Defendants correctly argue that Plaintiff's claims against them are redundant because suits against municipal agents in their official capacities are actually suits against the municipality. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In its complaint, Plaintiff makes clear that it is suing the Individual Defendants in their official capacities, and Plaintiff fails to offer any reason why this suit should not proceed only against the City itself. The court will, therefore, allow Defendants' motion on all counts as to all Individual Defendants.

## D. RLUIPA.

■■■ It is axiomatic that courts should refrain from addressing constitutional is-

---

7. This ruling is consistent with those of other courts facing similar questions of ripeness in the context of Free Exercise challenges to landmark ordinances. *See, e.g., Metropolitan Baptist Church v. Dist. of Columbia Dep't of Consumer & Regulatory Affairs,* 718 A.2d 119, 132 (D.C.1998) (claim not ripe because the court "cannot say that there is a concrete dispute between the parties in the absence of a decision on a permit application or at least some preliminary step toward that end"); *Church of St. Paul & St. Andrew v. Barwick,* 67 N.Y.2d 510, 505 N.Y.S.2d 24, 496 N.E.2d 183, 190 (1986) (claim not ripe because "the effect [of the landmarks law] cannot be determined until plaintiff has sought and the Commission has granted or denied a certificate of appropriateness").

Courts facing RLUIPA challenges to other zoning ordinances have reached the same conclusion. *See, e.g., Congregation Anshei Roosevelt v. Planning & Zoning Bd. of Bor-*
*ough of Roosevelt,* 338 Fed.Appx. 214, 218–19 (3d Cir.2009) (RLUIPA claim not ripe where plaintiff failed to file application for a variance and so "the Board has not issued a definitive position as to the extent [plaintiff] can operate on the synagogue property"); *Grace Community Church v. Lenox Twp.,* 544 F.3d 609, 616 (6th Cir.2008) (RLUIPA claim not ripe where church failed to complete the factual record, explain its position to the commission, or appeal to the board); *Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342, 350 (2d Cir.2005) (RLUIPA claim not ripe where city issued cease-and-desist order and plaintiff failed to file for a variance with Zoning Board of Appeals); *Taylor Investments, Ltd. v. Upper Darby Twp.,* 983 F.2d 1285 (3d Cir.1993) (RLUIPA claim not ripe where plaintiffs' use permit was revoked and plaintiffs did not appeal revocation or seek a variance before filing suit).

sues when the case may be resolved by a question of statutory interpretation. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Thus, the court will begin its analysis with Plaintiff's argument under 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), before moving on to the constitutional issues raised.

 Plaintiff argues that the Ordinance violates four provisions of RLUIPA: subsection (a), the substantial burden provision; subsection (b)(1), the equal terms provision; subsection (b)(2), the non-discrimination provision; and subsection (b)(3), the unreasonable limitations provision. As the Seventh Circuit notes, "[t]here is some obvious overlap in these statutory provisions ... [b]ut each of RLUIPA's land-use subsections captures a distinct kind of free-exercise harm and must be given its own force and effect." *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 382 (7th Cir.2010) (en banc). The court, therefore, will address each subsection in turn.

### 1. *Substantial Burden (Count Nine).*

 Plaintiff first argues that the Ordinance violates its rights by requiring Plaintiff, a religious institution, to seek approval from secular authorities before making changes to the exterior of its property. Specifically, the Ordinance requires Plaintiff to seek a certificate of appropri-

ateness, nonapplicability, or hardship that would exempt the proposed activity from the strictures of the Historic Districts Act. Thus, the argument runs, merely including Plaintiff's property within a historic district and thereby forcing it to comply with the application requirement burdens Plaintiff's free exercise of religion.[8]

Subsection (a) of RLUIPA reads as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

The first question is whether the ripe issues before this court involve some "religious exercise" under the meaning of the statute. RLUIPA defines "religious exercise" as follows:

> (A) In general[.] The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.
>
> (B) Rule[.] The use, building, or conversion of real property for the purpose of religious exercise shall be considered to

---

**8.** To the extent that Plaintiff argues that the mere interaction between government officials and church officials violates the Free Exercise Clause without respect to the burden imposed, Plaintiff's argument is unsupported by the law and confuses Free Exercise jurisprudence with Establishment Clause jurisprudence. *Compare Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (interpreting the Establishment Clause as prohibiting "excessive government entan-

glement" with religion) *with Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–33, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (explaining that the Free Exercise Clause applies to laws "burdening a particular religious practice" or "targeting religious beliefs"). The complaint does, however, make passing reference to the Establishment Clause, (Compl. ¶ 34), so the court will address this argument in greater detail in Part E.2 *infra*.

be religious exercise of the person or entity that uses or intends to use the property for that purpose.

42 U.S.C. § 2000cc–5(7). Defendants point out that the Our Lady of Hope Church no longer holds religious services. They argue that Plaintiff's proposed actions—the removal of religious artifacts from church property in preparation for the sale or demolition of the church itself—is not a "religious exercise." Plaintiff counters that this process, referred to as "deconsecration," is critically important to the Church's religious mission.

Plaintiff has the better argument. RLUIPA broadly protects "*any* exercise of religion" and does not require that the practice be central to Plaintiff's system of beliefs. *See* 42 U.S.C. § 2000cc–5(7)(A) (emphasis added). *See also* 42 U.S.C. § 2000cc–3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution."). Certainly, the removal and preservation of, *inter alia,* crosses and stained glass windows depicting scenes in the life of Jesus Christ, are forms of religious exercise. The fact that these activities are not part of the Church's worship services is irrelevant. Defendants' argument concerns the significance of this religious activity—an inquiry not permitted by statute. *See* 42 U.S.C. § 2000cc–5(7)(A). Thus, Plaintiff easily satisfies RLUIPA's first requirement.[9]

▇ Because there is no dispute that the Ordinance imposes a "land use regulation," [10] the only remaining issue under this provision is whether "historic district" status creates a "substantial burden" on Plaintiff's free exercise of religion. This is often the most contentious part of the RLUIPA analysis; RLUIPA does not define the phrase "substantial burden." However, RLUIPA's legislative history clarifies that a substantial burden "must be established 'by reference to Supreme Court jurisprudence' under the Free Exercise clause of the First Amendment." *Regulating Historic Religious Properties Under RLUIPA,* SL014 ALI–ABA at 724 (quoting 146 Cong. Rec. S. 7776 (July 27, 2000)). The Supreme Court "made clear in other contexts that the 'substantial burden' hurdle is high and that the issue is intensely fact-specific." *Mintz v. Roman Catholic Bishop of Springfield,* 424 F.Supp.2d 309, 319 (D.Mass.2006) (citing list of cases and holding that city's denial of permit to build parish center substantially burdened diocese's rights).

Although the First Circuit has not yet weighed in, other circuits have issued varying interpretations of this phrase. *See, e.g., San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034–35 (9th Cir.2004) (substantial burden is one that "impose[s] a significantly great restriction or onus upon [religious] exercise"); *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1227 (11th Cir. 2004) (substantial burden is one that "place[s] more than an inconvenience on religious exercise" and is "akin to significant pressure which directly coerces the religious adherent to conform his or her

---

**9.** The court's ruling on ripeness does not alter this analysis. Although Plaintiff cannot argue at this point that the Ordinance prohibits deconsecration, Plaintiff can and does maintain that the Ordinance causes delay and expense, which impede the process.

**10.** Although Defendants initially argued in their brief that the Ordinance was not a land use regulation, they later conceded that 42 U.S.C. § 2000cc–5(5) defines land use regulation as a "zoning or landmarking law ... that limits or restricts a claimant's use or development of land," which clearly encompasses the present statute.

behavior accordingly"); *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir.2003) (substantial burden is one that renders religious exercise "effectively impracticable").

██ Here, it is unnecessary to decide what constitutes a "substantial burden" because the burden imposed by complying with the Historic Districts Act is, on the undisputed facts of record, *de minimis.* Plaintiff alleges that filing for a certificate of exemption will result in "delay, uncertainty and expense," (Pl.'s Mem. Supp. Mot. Summ. J. at 30), but Plaintiff fails to offer any evidence to substantiate that claim. In a footnote in its second opposition brief, Plaintiff asserts that "[t]he application process is not an insignificant one," noting that the process requires the submission of "plans, elevations, specifications, material and other information." (Dkt. No. 29, Pl.'s Opp'n to Defs.' Mot. Summ. J. at 6 n. 1.) These allegations are vague and conclusory and are insufficient to demonstrate a substantial burden. The court's "substantial burden" analysis makes understandable the requirement that plaintiffs file "one meaningful application" with a municipal body before filing suit. *See Gilbert v. City of Cambridge,* 932 F.2d 51, 60–61 (1st Cir.1991) ("[T]he filing of one meaningful application will ordinarily be a necessary, although not alone sufficient, precondition for invoking the futility exception."). If Plaintiff had presented one application, then the record would contain some concrete evidence of the burden imposed. Here, there is no evidence even of discussions. In these circumstances the court is obliged to conclude that no sufficient evidence of burden has been offered.

Plaintiff invokes a decision from the Washington Supreme Court, *First Covenant Church of Seattle v. City of Seattle,* which held that the mere designation of the First Covenant Church of Seattle as a historic landmark imposed administrative and financial hardship on the plaintiff's religious exercise. 120 Wash.2d 203, 840 P.2d 174 (1992). *First Covenant* is easily distinguishable from this case. The Washington court was not tasked with determining whether the administrative burden was substantial, and, in fact, the court never addressed the weight of that burden in isolation. The court instead focused on the fact that the landmark designation "so grossly diminishes the value of the Church's principal asset that it impermissibly burdens First Covenant's right to free exercise of religion," *id.* at 220, 840 P.2d 174, evidence that is nonexistent here.

In any event, this court is not bound by *First Covenant,* and extensive case law exists to the contrary. For example, in rejecting a religious organization's claim under RLUIPA, the Seventh Circuit held that "the costs, procedural requirements, and inherent political aspects" of the permit approval process were "incidental to any high-density urban land use" and thus "[did] not amount to a substantial burden on religious exercise." *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir.2003) ("*CLUB*"). A district court applied *CLUB*'s holding to a RLUIPA claim in which the plaintiff made the same argument as the one offered here—that compliance with a permit requirement would result in "delay, uncertainty and expense." *Family Life Church v. City of Elgin,* 561 F.Supp.2d 978 (N.D.Ill.2008). Observing that not all "delays, uncertainties and expenses are substantially burdensome," the court held, "[w]hile surely inconvenient, the eight-month application process [plaintiff] encountered does not rise to the level of a substantial burden." *Id.*

Other federal courts of appeals have rejected similar claims under RLUIPA as well. *See, e.g., Konikov v. Orange County,*

410 F.3d 1317, 1323 (11th Cir.2005) ("[R]e-quiring applications for variances, special permits, or other relief provisions [does] not offend RLUIPA's goals."); *San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034–35 (9th Cir.2004) (holding that city's requirement that plaintiff refile a "complete" application for a building per-mit did not constitute a substantial bur-den).

■ Moreover, these outcomes are consistent with RLUIPA's Congressional Record.

> This Act does not provide religious insti-tutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay.

146 Cong. Rec. S7774–01, *S7776 (2000) (Joint Statement of Sens. Hatch and Ken-nedy on the Religious Land Use and Insti-tutionalized Person Act of 2000). Con-gress's rationale is clear: any contrary interpretation would provide religious groups with *carte blanche* to pick and choose which zoning requirements to fol-low. *See Petra Presbyterian Church v. Vill. of Northbrook,* 489 F.3d 846, 851 (7th Cir.2007) ("Unless the requirement of sub-stantial burden is taken seriously, the diffi-culty of proving a compelling governmen-tal interest will free religious organizations from zoning restrictions of any kind."). Certainly, RLUIPA was not intended to grant religious groups such unbounded discretion.

In sum, Plaintiff has not shown that the administrative burden thrust upon it by virtue of its property's inclusion within a historic district was anything more than an inconvenience. Because this claim falls far short of the standard set forth in 42 U.S.C. § 2000cc(a)(1), Defendant's motion will be allowed as to Count Nine.

### 2. *Equal Terms (Count Eight).*

■ Plaintiff also alleges that the Ordi-nance infringes on its rights by targeting property owned by Plaintiff, a religious institution. Because the Ordinance singles out Plaintiff's property for disparate treat-ment, Plaintiff argues that the Ordinance violates subsection (b)(1) of RLUIPA, the Equal Terms provision.

■ Subsection (b)(1) provides that "[n]o government shall impose or imple-ment a land use regulation in a manner that treats a religious assembly or institu-tion on less than equal terms with a nonre-ligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The federal courts of ap-peals agree that a plaintiff need not estab-lish a substantial burden to bring a claim under RLUIPA's Equal Terms provision. *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 510 F.3d 253, 264 (3d Cir.2007); *Konikov,* 410 F.3d at 1327–29; *CLUB,* 342 F.3d at 762. The courts do not agree, however, on how to apply this vague "equal terms" standard. The circuit split centers on how broadly to construe the phrase "nonreligious assem-bly or institution" and whether plaintiffs must point to a similarly situated secular comparator that received more favorable treatment.[11]

---

11. *Compare Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,* 450 F.3d 1295, 1308 (11th Cir.2006) (plaintiff must demonstrate unequal treatment as com-pared to *any* secular institution or "assem-bly," according to its dictionary definition) (emphasis added) *with Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch,* 510 F.3d 253, 266 (3d Cir.2007) (plaintiff must demonstrate unequal treatment as compared to secular institutions "that are similarly situ-ated as to the regulatory *purpose* ") (emphasis

The First Circuit has not as yet taken a position on these issues, and the facts of this case require none to be taken here. Plaintiff presents no evidence of unequal treatment as compared to *any* secular comparator, whether similarly situated or not. The Ordinance reads as follows:

There is further established under the provisions and in accordance with the Historic Districts Act, so-called, as mentioned in this chapter, the Our Lady of Hope Historic District, as shown on the map, labeled Exhibit 27–2G, entitled "Our Lady of Hope Historic District;" said map to be considered part of this chapter.

Springfield, Mass., Rev. Ordinances ch. 2.46, § 2.46.030(G). The map clearly delineates the boundaries of the district, which, indeed, encompasses only the Our Lady of Hope Church. Plaintiff objects to the City's creation of a single-parcel district that applies only to property owned by a religious institution, referring to it as a form of discriminatory "reverse spot zoning." At first glance, this argument has some appeal. In this case, however, first impressions are misleading.

Plaintiff's argument mirrors one that the Supreme Court has flatly rejected, albeit within the context of a Takings claim.

It is true ... that both historic-district legislation and zoning laws regulate all properties within given physical communities whereas landmark laws apply only to selected parcels. But, contrary to appellants' suggestions, landmark laws are not like discriminatory, or 'reverse spot,' zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones. In contrast to discriminatory zoning, which is the antithesis of land-use control as part of some comprehensive plan, the New York City law embodies a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found in the city.

*Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 132, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (holding that the application of New York City's landmarking law to Grand Central Terminal did not effect an unconstitutional taking). *See also Rector, Wardens, and Members of Vestry of St. Bartholomew's Church v. City of New York,* 914 F.2d 348, 355–56 (2nd Cir.1990) (rejecting plaintiff's argument that landmark designation violated the group's Free Exercise rights on same grounds).

Although *Penn Central* distinguishes landmarking laws from historic-district legislation, Defendants have, in effect, landmarked the Our Lady of Hope Church by creating a single-parcel historic district. In fact, the Historic Districts Act (the "Act") is the functional equivalent of the landmarking laws that exist in many other states.[12] There is no question that, by enacting a single-parcel district, Defendants were acting well within their statutory grant of authority under this Act. The Act grants broad discretion to municipalities to make case-by-case determinations as to which properties deserve heightened protection due to their historic value. *See Springfield Preservation Trust, Inc. v.*

---

added) *and River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,* 611 F.3d 367, 371 (7th Cir.2010) (en banc) (plaintiff must demonstrate unequal treatment as compared to secular institutions that are similarly situated as to the "regulatory *criteria* ") (emphasis added).

**12.** Massachusetts does have a statute granting the state secretary the authority to designate historic landmarks, but this statute, unlike the Historic Districts Act, requires the owner's consent. Mass. Gen. Laws ch. 9, § 27 (West 2010). Thus, the scope of its power is far more limited.

*Springfield Library & Museums Ass'n, Inc.,* 447 Mass. 408, 852 N.E.2d 83, 93 (2006) ("The Act gives municipalities unfettered discretion whether to establish a historic district and, if so, what lands, buildings, and structures to include in that district."). While in some cases this process might involve several abutting properties of similar historic value, in others it will involve only one structure. Thus, there is nothing nefarious about a municipality's decision to apply the Act to a single parcel of land. In doing so, the City has recognized that Plaintiff's property contains unique characteristics that hold significant social and historical value.

Plaintiff's argument treats the Ordinance as an operatively independent statute, which it is not. Even *First Covenant,* a case Plaintiff repeatedly cites in its briefs, recognizes this point. *See First Covenant Church of Seattle v. City of Seattle,* 120 Wash.2d 203, 840 P.2d 174, 180–81 (1992). The landmark-designating ordinance at issue in *First Covenant* "was passed pursuant to the general [Landmarks] ordinance and is simply the means by which the Landmarks Ordinance is implemented." *Id.* (citations and quotation marks omitted). For that reason, the court considered the designating ordinance "part of the general act." [13] *Id.* The same is true here. The Ordinance is simply the means by which the City of Springfield has implemented the Historic Districts Act, and the Ordinance cannot be divorced from that Act. As *Penn Central* observes, the designation of a historic landmark is part of "a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found." *Penn*

*Central Transp. Co.,* 438 U.S. at 132, 98 S.Ct. 2646.

In fact, a designating ordinance merely formalizes an uncontroversial process that occurs in cities across the United States every day, whereby city officials are tasked with determining which properties trigger a particular zoning law and which do not. A designating ordinance expedites this process by identifying a particular property as conforming or not conforming to an existing zoning scheme. The Ninth Circuit elaborated on this distinction between ordinances that establish a new zoning law and ones that merely implement an existing scheme:

> An ordinance granting a [conditional use permit] is not a "general zoning ordinance." It affects only the parcel of land that is the subject of the application and has no further force or effect. We agree with the district court that granting or denying a [conditional use permit] constitutes ad hoc administration of the existing zoning ordinance.

*Kaahumanu v. County of Maui,* 315 F.3d 1215, 1220–21 (9th Cir.2003).

Historic designation ordinances are no different; they represent ad hoc administration of an existing zoning scheme. In other words, a designating ordinance simply codifies a city's reasoned decision that a particular property falls under the Historic Districts Act. The fact that the designating ordinance applies to only one property holds no import. Therefore, without any evidence of unequal treatment, Plaintiff's claim under 42 U.S.C. § 2000cc(b)(1), Count Eight, fails as a matter of law, and Defendants' motion must be allowed.

---

**13.** The court then held that the landmark designation ordinance at issue was not neutral with respect to religion because it required an inquiry into whether the proposed actions were motivated by matters of "liturgy." *First Covenant Church of Seattle,* 840 P.2d at 180–81. The Ordinance here, however, does not contain any comparable language.

### 3. Non-discrimination Provision (Count Eight).

 Plaintiff next argues that the Ordinance violates RLUIPA's nondiscrimination mandate, which states, "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Plaintiff lumps this violation into the same count (Count Eight) as its Equal Terms argument and makes no attempt to distinguish these provisions. Furthermore, the nondiscrimination provision sets a higher bar for plaintiffs by requiring evidence that the government action was motivated by ("on the basis of") religion.

Plaintiff does, at one point, suggest that Defendants yielded to the concerns of disgruntled parishioners, who feared the possibility of the church's demolition, and imposed historic status on the church to appease them. Plaintiff argues "the implications of that conduct ... may [create] a disputed issue of fact." (Dkt. No 29, Pl.'s Opp'n to Defs.' Mot. Summ. J. at 3.)

This argument is unavailing. First, it is not clear how such considerations demonstrate discriminatory animus. Second, Plaintiff presents no evidence to substantiate its claim that these considerations played a role in the Commission's decision to propose this Ordinance to the City Council. Third, the Commission's report is replete with information justifying its decision based on rational, objective criteria. (See Dkt. No. 26, McCarroll Aff., Ex. 4.) Consequently, there is no genuine issue as to whether Defendants harbored some form of discriminatory animus in passing the Ordinance. See Fed.R.Civ.P. 56(e). Without such evidence, Plaintiff's argument fails, and Defendants' motion will be allowed as to Count Eight.

### 4. Unreasonable Limitations Provision (Count Ten).

Plaintiff also brings a cause of action under subsection (b)(3)(B) of RLUIPA, which states that "[n]o government shall impose or implement a land use regulation that ... unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b). Plaintiff offers no extended argument regarding subsection (b)(3)(B) in its Memorandum, (Dkt. No. 15, Pl.'s Mot. Summ. J. at 32.), and for good reason: nothing in the Ordinance in any way "limits religious assemblies, institutions, or structures within a jurisdiction." Thus, the provision is clearly inapplicable to these facts, and Defendants' motion will be allowed as to Count Ten.

### E. Remaining Federal Claims.

#### 1. The Free Exercise Clause of the First Amendment (Count One).

The First Amendment to the United States Constitution prohibits the government from legislating "an establishment of religion or prohibiting the free exercise thereof." U.S. Const. Amend. I. The First Amendment applies to states and local governments through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Plaintiff argues that the Ordinance violates the Free Exercise Clause of the First Amendment in two ways. First, Plaintiff contends that it is not a "neutral law of general applicability" under Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), but rather a system of "individualized assessments," triggering strict scrutiny. Second, Plaintiff asserts

that the Ordinance is an unconstitutional "religious gerrymander."

■ The following analysis necessarily requires some overlap with the previous discussion on RLUIPA because, to a significant extent, RLUIPA merely codifies existing Supreme Court precedent. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir.2004) ("RLUIPA's equal terms provision codifies [First Amendment] precedent."); *Freedom Baptist Church of Del. Cnty. v. Tp. of Middletown*, 204 F.Supp.2d 857, 868 (E.D.Pa.2002) ("What Congress manifestly has done in [the substantial burden provision] is to codify the individualized assessments jurisprudence in Free Exercise cases that originated with the Supreme Courts decision in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)."). Nonetheless, these inquiries are not identical, so the court will independently examine Plaintiff's arguments under the First Amendment.

■ Under the First Amendment's Free Exercise Clause, courts must apply strict scrutiny to "governmental classifications based on religion," but not to "neutral laws of general applicability" that *incidentally* burden the free exercise of religion. *Smith*, 494 U.S. at 879, 110 S.Ct. 1595. *Smith* contrasted "generally applicable" tax laws with laws containing "a system of individualized exceptions" that result in "individualized governmental assessment" of the conduct governed. *Id.* at 884, 110 S.Ct. 1595 (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). Because such laws are not generally applicable, they trigger strict scrutiny. *Id.* Additionally, the Court later contrasted truly neutral laws with facially neutral laws that are designed to target religious practice, resulting in an impermissible "religious gerrymander."

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring)). Similar to individualized assessments, laws creating a "religious gerrymander" require strict scrutiny by the judicial system. *Id.*

■ Plaintiff suggests that the Ordinance is not neutral because it creates a "religious gerrymander" by targeting Plaintiff's property and is not generally applicable because it involves "individualized governmental assessment" of the conduct governed. Plaintiff urges the court to examine the neutrality of the Ordinance itself, arguing that it is not neutral because it applies only to Plaintiff's property. Plaintiff's arguments are unpersuasive largely for the reasons discussed above: they misconceive the nature of the Historic Districts Act. To avoid undue repetition, the court merely notes that the Ordinance represents a finding that Plaintiff's property falls under the strictures of the Historic Districts Act; the Ordinance has no independent power and any imposition on Plaintiff flows from the Act.

To apply Free Exercise precedent, then, the court must look to the Historic Districts Act itself. The Act sets forth specific criteria for determining which properties it governs. Unlike in *Lukumi*, where the statute's criteria subtly (but transparently) targeted religious practice, these criteria are undeniably neutral both in appearance and in substance. *See* Mass. Gen. Laws ch. 40C, § 7 (West 2010) (listing criteria such as "the historic and architectural value and significance of the site, building or structure" and "the general design, arrangement, texture, material and color of the features involved"). Plaintiff does not argue to the contrary.

■ Plaintiff's argument concerning the Ordinance's "general applicability," or lack thereof, presents a more difficult question. Plaintiff's position is twofold. First, Plaintiff again mistakenly focuses on the Ordinance in isolation, arguing that it impermissibly applies only to Plaintiff's property. Second, Plaintiff argues that the Historic Districts Act creates a system of individualized governmental assessments by allowing the City to grant certificates of exemption to individual property owners. This appears to be a plausible interpretation of *Smith*. In fact, other property owners have raised this argument in Free Exercise challenges to various zoning laws containing similar exemptions,[14] and a split of authority exists on this point. However, because Plaintiff has failed to file even one application for an exemption, this issue is not ripe for review at this time. *See* Part B *supra*.

In addition, even if Plaintiff succeeded in arguing that the Historic Districts Act was not generally applicable because it creates a system of individualized assessments, Plaintiff would still be left with the problem of demonstrating a substantial burden on its religious exercise. *See Smith*, 494 U.S. at 883–84, 110 S.Ct. 1595 (discussing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). As ex-

plained above, Plaintiff has presented no evidence that would support such a finding.

2. *The Establishment Clause of the First Amendment (Count One).*

■ Plaintiff also alleges that the Ordinance offends the First Amendment's Establishment Clause because it "does not have a secular purpose, its principal or primary effect inhibits freedom of religion, and it fosters an excessive government entanglement with religion." (Compl. ¶ 34.) The First Amendment clearly prohibits government from engaging in the "establishment of religion." U.S. Const. Amend. I. What constitutes an establishment of religion is less clear. The Supreme Court has produced a three-part test to elucidate when government action does *not* engage in the establishment of religion:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally the statute must not foster an excessive government entanglement with religion.

*Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (cita-

**14.** In assessing RLUIPA claims, several courts have found that permit and variance applications involve individualized assessments. *See Fortress Bible Church v. Feiner*, 734 F.Supp.2d 409, 498–99 (S.D.N.Y.2010) (citing lengthy list of cases and reaching same conclusion). At least three courts have held that landmark laws in particular create a system of "individualized assessments." *See, e.g., First Covenant Church of Seattle v. City of Seattle*, 120 Wash.2d 203, 840 P.2d 174, 181 (1992); *Keeler v. Mayor & City Council of Cumberland*, 940 F.Supp. 879, 885–86 (D.Md. 1996); *Episcopal Student Found. v. City of Ann Arbor*, 341 F.Supp.2d 691, 699 (E.D.Mich.2004). *But see Rector, Wardens, and Members of Vestry of St. Bartholomew's*

*Church v. City of New York*, 914 F.2d 348, 354 (2nd Cir.1990) (holding that landmark law was neutral law of general applicability and failing to address issue of individualized assessments).

Other courts, however, have backed away from *Smith*'s broad language regarding individualized assessments, holding that some zoning laws involving exemptions and special use permits are neutral laws of general applicability. *See, e.g., Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276–77 (3d Cir.2007); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 654 (10th Cir.2006); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir.2003).

tions and quotation marks omitted).[15]

Plaintiff has not developed this argument in much detail, and it is clear that no action by Defendant has run afoul of the Establishment Clause. First, as explained in Part D.3 *supra*, Plaintiff offers no support for its allegation that Defendants passed the Ordinance with an improper motive. Second, it is unclear how, if at all, the Ordinance advances or inhibits religion. Plaintiff's only conceivable argument is that denial of a certificate of exemption would inhibit religion, but that certainly does not appear to be the Ordinance's "principal or primary effect." *See Lemon*, 403 U.S. at 612, 91 S.Ct. 2105. In any event, that issue is not ripe for review. *See* Part B *supra*. Third, regarding the "excessive entanglement" prong, the only ripe argument available to Plaintiff is that the mere requirement to submit a plan for review would transgress *Lemon*. Based on the authorities already cited, this argument, if accepted, would exempt church property from all zoning limitations and is simply not sustainable.[16] Indeed, even if Plaintiff had gone through the application process and had been denied, it is unlikely that Plaintiff could show that this entanglement was "excessive." *See generally Agostini v. Felton*, 521 U.S. 203, 233, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (treating entanglement prong as aspect of effects prong and requiring plaintiff to show that entanglement advances or inhibits religion); *see also Rector, Wardens, and Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 356 n. 4 (2d Cir.1990) (holding that city's decision to landmark plaintiff's property did not create an unconstitutional entanglement because "[t]he only scrutiny of the Church occurred in the proceedings for a certificate of appropriateness, and the matters scrutinized were exclusively financial and architectural."). For these reasons, Defendants' motion will be allowed as to Count One.

### 3. The Equal Protection Clause of the Fourteenth Amendment (Count Five).

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. Because Plaintiff has failed to produce *any* evidence of unequal treatment, Defendants' motion will be allowed as to Count Five.

### 4. The Due Process Clause of the Fourteenth Amendment (Count Seven).

Plaintiff has not explained how the Ordinance deprives it of life, liberty, or property. *See* U.S. Const. Amend. XIV. Thus, Defendants' motion will be allowed as to Count Seven.

---

**15.** Although the Supreme Court has raised questions as to *Lemon*'s continuing vitality, the Court has not expressly overruled it, and so it remains binding law. *See Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1029–31 (10th Cir.2008) ("Despite scattered signals to the contrary, the touchstone for Establishment Clause analysis remains the tripartite test set out in *Lemon*.").

**16.** *See, e.g., Cohen v. City of Des Plaines*, 8 F.3d 484, 493–94 (7th Cir.1993) (holding that city's requirement that religious organization obtain special use permit did not impermissi-

bly entangle government with religion); *Metropolitan Baptist Church v. Dist. of Columbia Dep't of Consumer & Regulatory Affairs*, 718 A.2d 119, 131 n. 15 (D.C.1998) ("To the extent that the church may be arguing that the mere inclusion of church property used for religious purposes within an historic district is *per se* unconstitutional, regardless of the actual burden that might be imposed by such inclusion, that broad proposition has been rejected in cases with facts considerably more telling than those here.").

### F. State Claims

#### 1. Article 46, Section 1 (Count Two).

 Plaintiff also challenges the Ordinance under Article 46, Section 1 of the Amendments to the Massachusetts State Constitution. While Massachusetts law grants broader protections to Free Exercise plaintiffs than federal law, *see Attorney General v. Desilets,* 418 Mass. 316, 636 N.E.2d 233, 236 (1994) (rejecting the *Smith* standard), here the alleged burden on Plaintiff's religious exercise was minimal and, thus, does not establish a cause of action under state law. Accordingly, Defendants' motion will be allowed as to Count Two.[17]

#### 2. Equal Protection (Count Six).

Because Plaintiff has failed to produce evidence of unequal treatment, Defendants' motion will be allowed as to Count Six.

#### 3. Massachusetts Civil Rights Act (Count Eleven).

Count Eleven asserts a violation of Mass. Gen. Laws ch. 12, § 11I. Because "a municipality is not a 'person' covered by the Massachusetts Civil Rights Act," *see Howcroft v. City of Peabody,* 51 Mass.App. Ct. 573, 591–92, 747 N.E.2d 729 (2001), and because all claims against the Individual Defendants are dismissed, Defendants' motion will be allowed as to Count Eleven.

#### 4. Massachusetts Declaratory Judgment Act (Count Twelve).

Count Twelve does not state a cause of action but rather contains a prayer for relief based on the Massachusetts Declaratory Judgment Act. Mass. Gen. Laws ch. 231(A). Thus, Defendants' motion will be allowed as to Count Twelve.

### IV. CONCLUSION

As noted in the introduction, a mainstay of this analysis is the fact that the case arises in the absence of any submission pursuant to the Ordinance. If such a submission were made, the Historical Commission's response might, or might not, alter the analysis in a future legal challenge. What can be said with certainty now, however, is that no constitutional or statutory rights of Plaintiff have been or are being violated. It is, one hopes, not beyond possibility that wise and respectful discussions might lead to a resolution of the controversy around Our Lady of Hope Church that will be satisfactory to all concerned.

For the foregoing reasons, Defendants' Cross Motion for Summary Judgment (Dkt. No. 22) is hereby ALLOWED in its entirety, and Plaintiff's Motion for Summary Judgment (Dkt. No. 14) is hereby DENIED in its entirety. The clerk will enter judgment for Defendants. This case may now be closed.

It is So Ordered.

---

**17.** Plaintiff's claim tiptoes around an unsettled area of state law. In *Society of Jesus of New England v. Boston Landmarks Comm'n,* the Massachusetts Supreme Judicial Court declared unconstitutional a statute that designated the interior of a Jesuit church a protected landmark and prevented the plaintiffs from renovating the church's interior. 409 Mass. 38, 564 N.E.2d 571, 574 (1990). The court expressly declined to address the issue of exterior alterations to places of worship. *Id.* at 572 n. 2. Here, Plaintiff's failure to seek an exemption removes this issue from the court's purview.